NEW YORK SCAFFOLDING CO. v. LIEBEL-BINNEY CONST. CO.

(Circuit Court of Appeals, Third Circuit. July 3, 1917.)

No. 2205.

PATENTS ☞328—INVENTION—SCAFFOLD-SUPPORTING MEANS.

The Henderson patent, No. 959,008, for a scaffold-supporting means, discloses merely a different construction of the device of the prior Murray patent, No. 854,959, without any real improvement, and is void for lack of patentable invention.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the New York Scaffolding Company against the Liebel-Binney Construction Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of ORR, District Judge:

This is an ordinary patent suit in which United States patent No. 959,008, for "scaffold-supporting means," issued May 24, 1910, to E. H. Henderson is involved. The defenses are that the patent is invalid for want of invention and that, if the patent be valid, yet defendant has not infringed. The claims of the patent in issue here were in issue in certain other litigation brought by the plaintiff herein against one Whitney in the District Court of the United States for the District of Nebraska. The result in that litigation was that the Court of Appeals of the Eighth Circuit, by a divided court, reversed the court below and adjudged the claims 1 and 3 of the patent valid. This present case has been under consideration for some time in the hope that this court would reach the same conclusion that was reached by the Circuit Court of Appeals of the Eighth Circuit. New York Scaffolding Co. v. Whitney, 224 Fed. 452, 140 C. C. A. 138. The rule of comity does not demand that a judge of another court shall "abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals." Mast, Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485–489, 20 Sup. Ct. 708, 710 (44 L. Ed. 856).

The necessity of scaffolding in all building operations of magnitude has ever been apparent. Originally, scaffolding was made to rest upon the ground and was increased in height as the building of the structure demanded. The expense of scaffolding necessarily increased with the height of the scaffolds. The natural result was that when the builder could drop his scaffolding from the top of the building with less expense than would be required to raise it from the ground he naturally did so. So with respect to the exterior decoration of a building, when the painter's ladders were not long enough to reach to the height required, the painter devised means by which he could sustain a platform, or as it is often called, a painter's stage or boat, from the roof of the building. The painting of a vessel's hull at sea involved necessarily the dropping of a platform or a plank from some supports made to rest upon or above the deck. The swinging of a boat from the davits would suggest a means by which the painter's stage used in the painting of a vessel could be swung. To those who are accustomed to observe, it is a matter of common knowledge that many men use different means to accomplish the result at which they may all aim; but it is also observed that men in the same art will oftentimes use the same means to accomplish the end sought, although there may have been great distance between them and no communication.

Utility is often urged as an important factor in determining patentability, but utility must be connected with invention in order to have weight in such determination. Having found that there was no invention in the Henderson device, a consideration of its utility is of slight value, yet the extent to which

the plaintiff uses the device of the Henderson patent, if it be less in degree than the extent to which other devices controlled by it, intended to accomplish the same purpose, are used, some light, though little, may be thrown upon the question of novelty, which is also a material element of patentability.

The plaintiff is not a manufacturer of devices, but is the holder and owner of patents under which licenses have been granted to the Patent Scaffolding Company, which constructs or causes others to construct the devices alleged to be covered by the patents. The practice of the Patent Scaffolding Company is not to sell the devices, but to rent them to contractors who may require the use of scaffolding in the erection of tall buildings. By judicious advertising and by permitting contractors to have the devices for the necessary period, at less than what it would cost to construct them, the Patent Scaffolding Company has created a large business, and the plaintiff receives substantial returns under the licenses granted by it.

The facts as revealed by the testimony negative the suggestion that there is anything novel in the device of the patent in suit. The demand created for the device is not the result of its novelty combined with utility, but of the business methods of the Patent Scaffolding Company.

We find from the specifications of the patent what Henderson desired to attain as expressed in the following language: "My invention relates to an improved means for supporting scaffolds used in connection with the construction of buildings and their repair. Scaffolds for this purpose are preferably of the swinging type supported by cables from outriggers temporarily secured to the upper part of the building. It has been the practice in the past to associate hoisting means with the cables at the outriggers and in some cases it has been proposed to use such hoisting means in connection with the cables on the scaffold to adjust the height as required in connection with the work. My invention relates to an improved form of hoisting mechanism carried by the scaffold for securing the same to the cables, the upper ends of which are connected to outriggers, generally temporary in character, secured to the upper portion of the building."

It is to be noticed in that language that Henderson recognized the prior use of scaffolds of the swinging type, supported by cables from outriggers, and that he recognized the use of the hoisting means in connection with the cables on the scaffold to adjust the height as required in connection with the work. Henderson did not have to say, what every one knew, that as part of a scaffold floor, pieces were used extending between and resting upon cross-beams called putlogs.

In considering the claims in suit, we find that, in addition to these various elements, Henderson claimed a combination with U-shaped bars in which the crossbeams or putlogs are laid, upon which the floor pieces are sustained. The claims are as follows:

Claim 1: "A scaffold consisting in the combination of crossbeams, floor pieces extending between such beams, and a hoisting device associated with each end of each beam, each hoisting device consisting of a continuous U-shaped metal bar extending around the under side of and upward from the associated beam, and a hoisting drum rotatably supported by the side members of such bar."

Claim 3: "A scaffold consisting of a plurality of U-shaped bars arranged in pairs, a crossbeam laid in and extending between each pair of such U-shaped bars, a floor laid upon said crossbeam, a drum rotatably supported between the upwardly extending side members for each of said U-shaped bars, and means for controlling the rotation of said drum."

The support of the hoisting device by the side members of the metal bar is found in United States patent to Murray, 854,959, dated May 28, 1907. In the United States patent to Bowyer and Casperson, No. 382,252, under date of May 1, 1888, is found a painter's stage in which there is a continuous metal bar extending around the under side of and upwardly holding one end of the plank upon which the painter rests. A similar one must be at the other end. The plank rests upon the lower part of that bar, just as the crossbeam rests upon the lower part of the U-shaped bar called for in the patent in suit. The plank, of course, is not large enough to afford support for bricks or mortar,

but if that plank support, as called for in the Bowyer and Casperson patent, be placed at right angles to the building and used as a putlog, and a similar plank resting in the same way be used as another putlog, upon which floor pieces can be placed, the arrangement would be the same as contemplated by Henderson in the patent in suit, so far as the resting of the beam upon the metal which forms the base of the U-shaped bar. The erection of outriggers for the support of the Bowyer and Casperson devices, arranged as suggested, would accomplish the same result as the device of Henderson and just as satisfactorily.

This court is not unmindful of the difficulty of ascertaining what is and what is not invention. In every case of a rearrangement of old parts it is urged that, because such rearrangement seems simple and natural, the court must avoid falling into the error of holding that there is no invention. It is insisted that the device under consideration would be found in prior patents and publications, if it were so simple to the men who claimed invention as appears after the patent has been granted. The argument is good where the patented device has filled a long-felt want and has immediately leaped into favor upon its own merits; but it is not sound where the device is one which has become widely used by reason of extensive advertising and reasonable charge for its use. It is a matter of observation that of recent years patents have been multiplied beyond precedent and not in proportion to the increased population. Many of them, which have each very slight variations from the other, are found in the same art. In many suits brought upon such patents it has developed that the method of the patent has been a shop practice for years, or that the device of the patent has been used by artisans to accomplish the result which the patentees hoped to secure especially for himself.

It was the intention of the framers of the Constitution that inventors could only be protected. It is well said by Judge Strong in Pearce v. Mulford, 102 U. S. 112–118, 26 L. Ed. 93: "But all improvement is not invention, and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art to which it relates." It seems clear that to a person skilled in the art of making or adjusting scaffolding, if he had a Bowyer and Casperson patent and the Murray patent before him, the arrangement of Henderson would be obvious if he desired to use it.

In the neighborhood of 70 per cent. of the scaffolding devices put out by the Patent Scaffolding Company are used, and are intended to be used, in accordance with the disclosure of the Murray patent. No. 854,959. The Patent Scaffolding Company in its catalogue in illustrations illustrated the Murray arrangement, and not the Henderson. According to the claims of the Henderson patent in suit, the frames of the machines are intended to be parallel with the wall of the building upon which they are to be used. The plane of the frames of the Murray machines are intended to be in the plane of the putlog which, of course, must be approximately at right angles to the building in order that the flooring of the scaffolding resting thereon may be extended along the side walls of the building. The putlogs indicated in the Murray patent consist of two pieces of angle iron bolted together in connection with the frames in which the hoisting devices are supported. This arrangement of the Murray patent makes the portions of the angle iron where they are connected with such frame equivalent to the bottom part of the U-shaped frame of the Henderson patent. In connection with the frames described in the Henderson patent in suit, in more than two-thirds of the machines used, the putlogs are the angle irons of the Murray patent and the bolts connecting the two angle irons with each frame rest upon the lower part of the "U" of the Henderson frame; that is to say, the Henderson frame, at this lower part, extends between the two pieces of angle iron below the bolts connecting the same. It therefore appears that in the vast majority of the frames used the putlogs do not extend through the frames as called for in the patent in suit, nor could they do so, because, as we have said, the vertical plane of the frame is in the vertical plane of the putlogs. This conclusion is strengthened by the fact that, while the plaintiff put in evidence a large number of photographs show-

ing the frame of the Henderson device, it did not put in evidence any photographs showing the use of the Henderson device and the putlog in the same relation as contemplated by the Henderson patent. The Henderson ·patent has not supplanted others, nor has the influence of its owner been exerted to that end. It barely represents a step in the art. It does not disclose invention.

In view of the conclusion reached by this court that claims 1 and 3 of the patent in suit are invalid, it is unnecessary to do more than touch upon the matter of infringement. The evidence of infringement is meager, and yet, if the claims of the patent in suit were to be held valid with a range of equivalents, infringement would be found. The defendant uses a device, known as the Whitney scaffolding device, which was the subject of the litigation in the case in the Eighth circuit above referred to. 224 Fed. 452, 140 C. C. A. 138. If the patent in suit were held to be valid to the exact form as described in the specifications, infringement would not be found, because the Whitney device does not appear to be an imitation of the Henderson device. While similar, they are not so like each other that builders would be deceived and take one for the other.

Another matter should be referred to. At the trial in this case, Whitney, who was the defendant in the suit in the Eighth circuit, was permitted to intervene in the suit in this court, without objection by either party. After the trial, the plaintiff moved for permission to file a supplemental bill, in which the only new matter alleged was the intervention of Whitney in the present case. and the final determination of the case in the Eighth circuit against Whitney's contention. It was not pretended that such decision would operate as res adjudicata, because the liability of the defendant in this suit could not be the liability of Whitney. As the case stood at the time of the motion, the plaintiff in this case and the plaintiff in the litigation in the Eighth circuit were one and the same ·person; but the defendant in this case was different from the defendant in the case in the Eighth circuit. While the decision in the Court of Appeals in the Eighth circuit might have been conclusive upon Whitney with respect to the validity of the patent in suit, yet it would not be conclusive upon the Liebel-Binney Construction Company, for the reason that the latter did not have its day in court.

The court is of the opinion that the plaintiff is not entitled to file its supplemental bill and has refused the motion.

The bill in this case must be dismissed, at the cost of the plaintiff. Let a decree be drawn.

C. P. Goepel, of New York City, and Clarence P. Byrnes, of Pittsburgh, Pa., for appellant.

Wallace R. Lane, Robert H. Parkinson, and George Mankle, all of Chicago, Ill., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is a suit for infringement of Letters Patent No. 959,008, issued to E. H. Henderson, May 24, 1910, and is here on the plaintiff's appeal from a decree of the District Court dismissing the bill on the ground of invalidity of the patent.

The patent is for scaffold-supporting means. The claims in issue are 1 and 3. The alleged infringing scaffold used by the defendant was known as the Whitney scaffolding device, manufactured and leased by Egbert Whitney under a junior patent. (Letters Patent No. 998,270 to Whitney.)

In the erection of modern steel frame structures, contractors have found it more economical to rent scaffolds than to buy them. This suit is a part of a controversy between rival scaffold renting con-

cerns. In other litigation instituted by this plaintiff against another defendant, involving the validity of the same claims of the Henderson patent and infringement by the same device of the Whitney patent, the Circuit Court of Appeals for the Eighth Circuit, reversing the District Court for the District of Nebraska, held the claims valid and infringed. New York Scaffolding Co. v. Whitney, 224 Fed. 452, 140 C. C. A. 138. In reaching an opposite conclusion in this case upon precisely the same issues and upon substantially the same facts, the learned District Judge hesitated, as do we, in disturbing the force of a decision of a court of coordinate jurisdiction and in preventing uniformity of decision by yielding to his own convictions. Yet we feel this is a case where comity, being a rule of convenience intended to persuade, not to command (Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 488, 20 Sup. Ct. 708, 44 L. Ed. 856), should not prevail against an opposite judgment when based upon clear conviction.

The matters which induced the District Court to its judgment, holding invalid a patent previously declared valid by another court, are fully set forth in its opinion, supra. These appeal to us with like convincing force. We shall consider them briefly.

In determining whether Henderson's device was a contribution to the art, involving invention, though narrow, or was merely a departure from the art by formal changes in prior devices, we must inquire what Henderson did and what problem he solved.

Scaffolds are as old as buildings; and scaffolds of different types have conformed time out of mind to the types of buildings upon which they were used. When buildings were low, scaffolds likewise were low, and were constructed along lines of greatest convenience, namely from the ground up. When structures increased in height, scaffolds likewise increased in height to a point where the elements of cost and danger induced a change. Then instead of being built from the ground upward they were suspended from the roof downward. When this change was found expedient, the art went for information to other arts in which scaffolds, by reason of their peculiar uses, had never been built upon the ground but had always been suspended from above. Among these was the seaman's art, in which was found the boatswain's chair, a simple contrivance made of a board with ropes through each end after the manner of a child's swing, which converge toward and are connected with a main rope slung from the mast-head or cross-tree, and passed through an overhead block and returned to the operator, by which he raised or lowered his position along the mast. Then there was the painter's stage or hanger, which is nothing more than a longer board, the ends of which are attached to ropes suspended from the ship's rail, capable of being raised and lowered from above or by blocks from below, and used by sailors when painting the ship's sides. The painter's stage was brought to land and conveniently used upon buildings. It consisted of a plank or planks used as a platform resting on cross-bars, the ends of which were held by ropes passed through blocks, which in turn were suspended from large metal hooks so shaped as to securely grasp the roof of the building. This platform was readily adjusted by block and fall to any elevation.

This crude but much used device was improved by Bowyer and Casperson in their Patent No. 388,252 (1888) by arranging in one structure an enlarged cross-bar or putlog and a drum by which to operate the overhead block and fall and elevate and lower the platform, which extended from one putlog to the other.

Platforms of both the crude and improved types were sufficiently steady for sailors and painters who did their work while sitting, but they were not sufficiently firm and steady for the heavier and more active work of bricklayers. As the demand for overhanging scaffolds increased with the increasing height of modern buildings, Clark (Letters Patent No. 673,384—1901) disclosed a mason's platform for such buildings by hanging perforated metal ribbons or strips in pairs from projected out-riggers, attaching putlogs to each pair, and suspending platforms on the putlogs. The platform was adjusted by pinning the putlogs at different positions in the perforations. Foster secured a patent (No. 763,274—1904) for substituting steel cables for the metal ribbons and bolt clamps for the pin fastenings of Clark, which, though held invalid by this court for want of patentable invention (American Safety Device Co. v. Liebel-Binney Construction Co., 242 Fed. ——, —— C. C. A. ——), was a scaffold in the art prior to Henderson. Scaffolds made like Clark and Foster in multiple pairs were found to possess rigidity, but they were adjustable only by changing the putlog sustaining bolts and pins, with loss of time and risk of injury. Cavanaugh overcame these difficulties by a patented device (No. 796,807—1905) for elevating scaffolds of this type by drums positioned on the out-riggers but operated by chains suspending loosely to the platform. Murray (No. 854,959—1907) improved upon Cavanaugh by changing the position of the drums from the projecting out-riggers to the platform. The hoisting mechanism of Murray consists of a drum with bearings mounted in upright arms of a rectangular metal frame connected and stiffened at the top and bottom by metal rods. The metal frame serves the double purpose of holding the drum in position and of affording a place for engagement with a putlog. To the lower part of the metal frame is rigidly attached one end of a putlog, the other end being similarly attached to the metal frame of another like hoisting mechanism. The drums in pairs are then connected with the pairs of steel cable of Foster. The platform extending from putlog to putlog may then be raised or lowered by winding or unwinding the drums in pairs. In this arrangement the drum frames are placed edgewise the building. This is to be noted because it is the principal thing, which, it is claimed, distinguishes Murray from the patent in suit.

This was the art when Henderson entered it. Henderson took the drum of Murray, positioned it in a drum frame in the same way and for the same purpose, but he made the frame U-shaped instead of rectangular, and changed the position of the frame and drum from edge to the building to flat with the building, thereby permitting a putlog to be loosely placed and held within the bend of the U. Much stress has been laid in this and other litigation on this difference in position of the drum and manner of engagement of the putlog. In this difference patentable invention is claimed, and has been found.

224 Fed. 452, 140 C. C. A. 138. This is the only difference we discern between Murray and Henderson. We are not satisfied that by this difference Henderson made any improvement, patentable or otherwise. He provided a loose and unfastened putlog in place of the fixed and fastened putlog of Murray, and lessened the fixity and rigidity of the whole platform, thereby correspondingly lessening the security of the workmen, which is just the opposite of what was pressed throughout the argument as the important consideration to induce masons to work with heavy materials upon swinging platforms. But however that may be, the evidence is that although Henderson followed Murray and claims to have improved upon his device, the Patent Scaffolding Company advertises only the Murray device, and seventy per cent. of the scaffolds it puts out and rents are the Murray device.

We do not see what problem was presented to and solved by Henderson. He did what Murray had already done, but did it in a different way. Patentable invention does not reside in mere difference, either of construction or result. The difference in construction is small indeed, involving nothing more than mechanical skill. The difference in result is a small saving of space upon the platform. This saving does not appear to have been demanded before the patent or valued after it. Finding no new problem presented or solved and no real improvement made, we cannot conceive patentable invention in Henderson's formal changes from the prior art. We are therefore of opinion that Claims 1 and 3 of the patent are void for want of patentable invention.

The decree below is affirmed.