**CARTER–WALLACE, INC.,**
**Plaintiff-Appellant,**

v.

**The GILLETTE COMPANY,**
**Defendant-Appellee.**

**CARTER–WALLACE, INC.,**
**Plaintiff-Appellee,**

v.

**The GILLETTE COMPANY,**
**Defendant-Appellant.**

**Nos. 81–1403, 81–1426.**

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1981.

Decided April 7, 1982.

Herbert P. Kenway, with whom George W. Crowley, Edmund R. Pitcher, and Kenway & Jenney, Boston, Mass., were on brief, for Carter-Wallace, Inc.

Robert W. Furlong, with whom Frank P. Porcelli, Gregory A. Madera, and Fish & Richardson, Boston, Mass., were on brief, for The Gillette Co.

Before CAMPBELL and BOWNES, Circuit Judges, WYZANSKI,* Senior District Judge.

BOWNES, Circuit Judge.

These appeals arise from a patent infringement action brought by Carter-Wallace, Inc., against The Gillette Company. The patent-in-suit covered the formula for an aerosol antiperspirant underarm spray called ARRID EXTRA DRY (Arrid). After a jury-waived trial, the district court, 531 F.Supp. 840, in a comprehensive well-written opinion found and ruled that Carter-Wallace's patent was invalid for obviousness and lack of criticality. The court specifically rejected Gillette's claim of anticipation. It also ruled that if the patent were valid, Gillette would be liable for infringement. The district court further found that the doctrine of file wrapper estoppel was not applicable. Gillette's motion for attorney's fees pursuant to 35 U.S.C. § 285 [1] was

---

* Of the District of Massachusetts, sitting by designation.

1. 35 U.S.C. § 285 provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

denied. Carter-Wallace appeals from the findings of obviousness and lack of criticality. Gillette cross-appeals the findings on anticipation and infringement.

BACKGROUND

Sometime after man emerged from the primeval state, it became apparent that the odor given off by the human body during and after perspiration was not particularly pleasing and the more civilized humans became, the more offensive became the smell of sweat. We are informed by reliable authority that perspiration itself does not have an unpleasant odor; it is the decomposition by bacteria of organic matter contained in the perspiration that smells. Because of the nature of the beast, the armpits are a particularly strong source of body odor. The use of clothes, which inhibits the free flow of air over the body, compounds the problem. Unfortunately for our olfactory senses, underarm sweating is a natural and necessary function of the human body. Man has striven mightily since time immemorial to reduce or disguise the after odor of body perspiration. For centuries, soap and perfume were the main weapons in man's continuing battle to smell sweet or, at least, avoid smelling too badly. Our era, in line with its general progress in science and technology, has seen the advent of two new weapons in the continuing war against body odor, the deodorant and the antiperspirant. The deodorant reduces odor by covering it up; it acts like and is indeed similar to perfume. The antiperspirant, on the other hand, goes to the root of the problem; it reduces perspiration. At first, deodorants and antiperspirants were applied in the form of creams and lotions. Then came a new breakthrough; the use of an aerosol spray to apply the product. This patent case is but one battle in the continuing struggle by cosmetic companies for access to the armpits of America. The amount of money involved in selling products promising to eliminate or reduce underarm perspiration and odor can be gauged by the fact that the inventors of the patent-in-suit were paid royalties of almost nine million dollars ($8,826,167.41).

Starting in the early sixties there was a concentrated effort by a number of companies to develop an aerosol spray for the effective application of an underarm antiperspirant. One of the problems was that the antiperspirant most commonly used, aluminum chlorohydrate, was a salt which when dissolved in water was corrosive to ordinary metals. The aluminum chlorohydrate also had a tendency to clog the apertures from which the aerosol spray was propelled. These side effects of aluminum chlorohydrate were due to the same thing that made it effective as an antiperspirant, its reaction with water. In order to be effective as an antiperspirant, the particles of aluminum chlorohydrate must be dissolved in water so as to produce aluminum ions which act as an astringent, reducing perspiration. Most of the aerosol sprays contained particles of aluminum chlorohydrate in an aqueous solution so they would be effective antiperspirants. Unfortunately, an aqueous solution of aluminum chlorohydrate also produces an acid which is corrosive to ordinary metals. Another aspect of aluminum chlorohydrate caused the clogging problem. It is hygroscopic; it absorbs moisture from the atmosphere. Clogging results when residual particles of aluminum chlorohydrate in the spray valve orifices absorb water from the atmosphere and crystallize. The corrosion and clogging problems could be reduced by using the antiperspirant in a dry powder form. This, however, resulted in a billowing or powder puff effect when applied. The American public preferred a moist application. The corrosive and clogging actions of aluminum chlorohydrate made it difficult to develop an aerosol antiperspirant spray that could be applied consistently and evenly.[2]

In 1965 George Spitzer and Lloyd Osipow, after a year's work, came up with an efficient antiperspirant aerosol spray. It overcame the corrosion and clogging problems

---

2. There was no such problem with the application of an underarm deodorant because it did not contain aluminum chlorohydrate. In 1961 Gillette brought out RIGHT GUARD, an aerosol deodorant which became a great commercial success.

and deposited a wet spray containing aluminum chlorohydrate that markedly reduced perspiration consistently and evenly on the armpit. Carter-Wallace learned of the Spitzer-Osipow formula, tested it, obtained the patent rights to it, and in 1967 introduced it commercially as Arrid. Arrid became an overnight success. In 1968 it captured ten percent of the underarm products market with sales of approximately twenty million dollars. By 1972 Arrid had sixteen percent of the market with sales of almost sixty-five million dollars. There must be factored into this sales picture the nearly fifty million dollars in advertising spent by Carter-Wallace between 1967 and 1972.

## DESCRIPTION AND CLAIMS OF THE PATENT

The district court accurately stated the objects of the patent:

> The stated objects of the patent are to provide an improved anti-perspirant aerosol formulation which: (1) causes minimum internal container difficulties and improved results with respect to corrosion and valve malfunction; (2) is applied to the skin as a wet spray in the form of a liquid suspension of astringent material, the astringent material being activated by the moisture of the air and the body; (3) imparts a feeling of lubrication and reduces the likelihood of inhalation problems; and (4) minimizes valve clogging and leakage.

Although the claims are restricted to aluminum chlorohydrate as the antiperspirant, the patent includes other salts that have antiperspirant qualities. The basic difference between the Spitzer-Osipow formula and the other antiperspirant solutions was that the aluminum chlorohydrate was expelled from the container suspended as a powder in hydrophobic (water repelling) oil. Many of the experts in this arcane field had believed that suspending the particles of aluminum chlorohydrate in oil would inhibit their astringent antiperspirant effect because moisture would be prevented by the oil from activating the particles and forming aluminum ions. For some unexplained reason, this does not happen; the antiper-

spirant action of the aluminum chlorohydrate is not inhibited by the oil which effectively eliminates the corrosion and clogging problem. We now turn to the specific issues in the case.

## OBVIOUSNESS

■ Our standard of review is clear:

> In this circuit, the question of obviousness vel non is essentially one of fact, see ITT v. Raychem Corp., 538 F.2d 453, 456 (1st Cir. 1976) and cases cited; cf. Spound v. Mohasco Industries, Inc., 534 F.2d 404 (1st Cir. 1976), and we will not reverse a district court's applications of the correct legal principles unless we believe them clearly erroneous. See Forbro Design Corp. v. Raytheon Co., 532 F.2d 758, 763 (1st Cir. 1976).

Rosen v. Lawson-Hemphill, Inc., 549 F.2d 205, 209 (1st Cir. 1976). See also Scully Signal Co. v. Electronics Corp. of America, 570 F.2d 355 (1st Cir. 1977), cert. denied, 436 U.S. 945, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); Dale Electronics v. R.C.L. Electronics, Inc., 488 F.2d 382 (1st Cir. 1973).

At the outset, we are faced with a serious question as to whether the district court applied the correct legal principles in determining the issue of obviousness. The statute pertaining to obviousness, 35 U.S.C. § 103, contains two sentences:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

It is the second sentence that concerns us. The Historical and Revision notes state:

> The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and

*experimentation or from a flash of genius.* (emphasis added).

As the Supreme Court pointed out in *Graham v. John Deere Co.*, 383 U.S. 1, 15, 86 S.Ct. 684, 692, 15 L.Ed.2d 545 (1966), this sentence was inserted into the statute because the Senate wanted to reverse the test it believed was established in *Cuno Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 91, 62 S.Ct. 37, 40, 86 L.Ed. 58 (1941): "That is to say, the new device, however useful it may be, must reveal the flash of creative genius, not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain."

The district court here made several statements in the course of its opinion which can only be construed to mean that its finding of obviousness rested in part on the fact that the Spitzer-Osipow formula was the result of experimentation, not an act of inventive genius. In discussing the testimony of Spitzer and Osipow, the court said: "This testimony of Spitzer and Osipow suggests that their discovery was not the result of inventive genius, but rather patient experimentation and trial-and-error. The significance of this will be discussed in greater detail below." The court in discussing the connection between obviousness and criticality stated: "*Whereas the inquiry into obviousness focuses primarily on the manner in which the claimed invention was made* and asks whether the results, though perhaps novel and beneficial, were suggested by what had gone before, . . . ." (emphasis added). In a later section of that part of the opinion discussing obviousness and criticality, the court said that, even if the plaintiff had proved criticality, its claims (1, 2, & 5) would fail for obviousness "for three reasons." The first reason was that "the claimed invention was not the result of any act of inventive genius, but rather resulted from routine experimenta-

tion." The court further stated that "routine experimentation would have eventually disclosed to the person of ordinary skill a combination of oil and powder which maximized adherence without adversely affecting efficacy or causing undue oiliness."

It is clear that the quoted statements were not offhand remarks but were made in the context of a finding that one of the reasons for determining that the patent-in-suit was obvious was that it resulted from the manner in which the formula was arrived at—by routine experimentation. This runs directly cross-grain to the intent and words of the second sentence of 35 U.S.C. § 103: "Patentability shall not be negatived by the manner in which the invention was made." We appreciate that the court made the factual inquiries required under *Graham v. John Deere*, 383 U.S. at 17–18, 86 S.Ct. at 693–694. It conducted a thorough review of the prior art and ascertained the differences between the prior art and the claims of the patent. It made specific findings on the secondary considerations of commercial success and the satisfaction of a long felt consumer need. We do not know, however, how much weight the court gave to the "manner in which the invention was made" and whether its view that routine experimentation helped prove obviousness skewed its perspective in considering the prior art and the secondary factors. We must, therefore, remand so the district court can reconsider its finding of obviousness without giving any weight to the fact that the formula was arrived at by experimentation rather than inventive genius.[3] The district court's errors in this regard prevent us from determining at this time whether or not a conclusion of obviousness properly arrived at would be supportable. Because the district court's criticality finding was so intertwined with the obviousness issue that it

---

**3.** We must note that one of the greatest inventions of all times, the electric light bulb, was the direct result of long toil and experimentation. "But the degree of difference between carbons that lasted one hour and carbons that lasted hundreds of hours seems to have been precisely the difference between failure and success, and the combination which first achieved the result 'long desired, sometimes sought and never before attained,' is a patentable invention." *Edison Electric Light Co. v. United States Electric Lighting Co.*, 52 Fed. 300, 308 (2d Cir. 1892).

cannot stand alone,[4] the court should review criticality as well as obviousness on remand.

There are, however, other issues not related to the question of obviousness upon which we can and do rule. We agree with the district court that Gillette's assertion of overclaiming should be rejected. For the reasons set forth by the district court, we see no merit in Gillette's claim of vagueness. We note additionally that Gillette itself had no trouble in using the formula as a basis for producing its own aerosol antiperspirant. We also agree with the district court that Gillette's "Best Mode" defense has no merit. Neither the valve nor the aerosol container was part of the invention. Nor do we see any real basis for the claim that the patent is invalid because of the failure of Carter-Wallace to explain to the Patent Office the relevance of certain prior art references. The finding of the district court that the failure was due to ignorance rather than fraud is adequately supported on the record.

## THE CROSS–APPEAL

There are two issues on cross-appeal: anticipation and infringement.[5]

### Anticipation

"To anticipate under section 102, a prior art reference must disclose all the elements of the claimed invention or their equivalents functioning in essentially the same way." *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 616 (1st Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976) (citations omitted). On appeal Gillette relies upon the Thiel patent and/or the Yakubik article. We have carefully examined both the Thiel patent and the Yakubik article and, although, as the district court indicated, they do deserve serious consideration as part of the prior art, neither "discloses all the elements of the claimed invention or their equivalents functioning in essentially the same way." We note again that Gillette's own actions belie its claim. It was not until after Gillette had an opportunity to analyze the Arrid product that it produced a successful aerosol antiperspirant.

### Infringement

There is substantial evidence on the record to support the district court's finding of infringement. We can only echo its words: "Each of Gillette's accused formulations contain all of the recited ingredients, or their substantial equivalents, in all of the required ratios set forth in the claims; each operates substantially as contemplated by the patent; and each achieves substantially the same result as is taught therein."

Nor do we see any merit in Gillette's argument that there was no infringement because file wrapper estoppel excludes products with alcohol. Gillette's contention is that because the patent excluded alcohol from its claims and Gillette's formulations contain a small amount of alcohol, it is not an infringer. The patent teaches the use of an hydrophobic oil, rather than alcohol, as the primary suspending medium for the antiperspirant (aluminum chlorohydrate). But the alcohol used in Gillette's formulations does not function as the suspending medium. It is added solely to aid the action of the suspending agent and does not change the essentials of the formula which in all vital respects tracks the Spitzer-Osipow patent. It would be a perversion of common sense and the patent law to apply the doctrine of file wrapper estoppel in this case.

*Affirmed in part, reversed in part; remanded for further proceedings consistent herewith.*

---

4. We are not ruling that on remand the court must consider obviousness and criticality separately. We mean only that because the court considered them both together, we are unable to, and indeed ought not, treat them separately.

5. Strictly speaking, infringement is part of the main case but, since it was discussed by Gillette in its main brief and by Carter-Wallace in its reply brief, we discuss it as part of the cross-appeal.