H.M. STICKLE, G. Martinez, I.M. Garcia, J.M. Davis, and B.M. Goodstein, and Double JJ Corporation—La Hacienda Mexican Food Machinery, a corporation of Texas, Plaintiffs,

v.

HEUBLEIN, INC., a corporation of Connecticut, Defendant.

No. 79–C–213–S.

United States District Court, W.D. Wisconsin.

June 25, 1984.

Christie, Parker & Hale, Pasadena, Cal., Bell, Metzner & Gierhart, Madison, Wis., for plaintiffs.

Chadwell & Kayser, Chicago, Ill., Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

After entry of judgment against defendant Heublein, Inc. for damages in the amount of $270,000.00, for prejudgment interest in the amount of $119,012.22, and for a reasonable attorney's fee, two motions, as well as the determination of the amount of the attorney's fee to be awarded plaintiffs, remain before the Court. The motions are denied and plaintiffs are awarded $334,474.00 in attorney's fees and expenses.

## THE MOTIONS

Following plaintiffs' unsuccessful motion for further injunctive relief, on April 13, 1984 defendant Heublein moved under Rules 52(b) and 59(e) for amendment of the Court's April 5th memorandum and order to reflect the plaintiffs position did not prevail in the first accounting trial held in this action and are thus not entitled to recover attorney's fees incurred at that stage in the proceedings. Plaintiffs in turn filed an untimely cross-motion on April 20, 1984 to amend the memorandum and order to state that plaintiffs are entitled to recover fees incurred on appeal because they eventually prevailed in the action as a whole.

In styling their motions as motions to amend findings or the judgment itself, both parties misconstrue the nature and significance of the Court's closing comments in its April 5th memorandum and order.

In that order, the Court stated,

[T]he fee award will not include compensation for services rendered at the initial and latest trials in connection with defendant's breach of warranty counterclaim. Nor will the award include compensation for services rendered in connection with the appeal in this matter, for the Court is of the opinion that, on the balance, plaintiffs did not prevail in that appeal.

Memorandum and Order of April 5, 1984, at 32.

On their face, those comments are not factual findings or conclusions of law, nor were they intended to be. Rather, the comments were intended to be a preview, or guidelines if you will, to aid plaintiffs in preparing their fee request and the defendant in challenging it. Accordingly, the Court does not consider its discretion constrained by its earlier pronouncements, and in fact departs from them below.

## THE ATTORNEY'S FEE AWARD

Title 35, United States Code, Section 285 states, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Under *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564 (7th Cir.1983), a recent Seventh Circuit case interpreting *Hensley*, an attorney's fee determination pursuant to a statutory exception to the American Rule has two parts. First, if, as here, a plaintiff seeks an award of fees, the Court must determine whether he or she attained the relief sought in the lawsuit and whether the lawsuit itself was causally linked to the achievement of that relief, i.e., whether the plaintiff prevailed. (In addition, in a patent or trademark case, the Court must determine whether the case was an exceptional one.)

Second, if the party seeking fees is found to have prevailed, the next step is to determine the amount of the fee award. The starting point for that particular endeavor is the product of the number of hours reasonably expended by counsel, multiplied by a reasonable hourly rate.

*Hensley,* 103 S.Ct. at 1939. Hours duplicating work of co-counsel or which are otherwise excessive in relation to the work performed should be eliminated, while the reasonable hourly rate applied for specific tasks should depend upon the complexity of the work involved, the experience of counsel, and the rates prevailing in the community. Inadequate documentation should result in a reduction downward of allowable hours. *Codex Corp. v. Milgo Electronic Corp.,* 717 F.2d 622, 631 (Fed.Cir.1983) (citations omitted).

■ In a patent case, the next task is to separate hours spent on patent claims, or on non-patent claims inextricably intertwined with patent claims, from hours spent on unrelated issues and claims. Only the former are eligible for reimbursement under § 285. *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1564 (Fed.Cir.1983). The process is analogous to that of separating hours spent on successful claims in a civil rights case from hours spent on unrelated, unsuccessful claims for a fee award under 42 U.S.C. § 1988. *See Hensley,* 103 S.Ct. at 1940.

■ The result of all this tinkering is what has been referred to as the lodestar fee. The last step in determining the amount of an attorney's fee award is to adjust the lodestar upward or downward to reflect the contingent nature of the fee, if it was contingent, delay in payment, the quality of representation, and the degree of success achieved. *Codex,* 717 F.2d at 631. The last factor is the most important. As the Supreme Court stated in *Hensley,*

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee ... [I]ndeed in some cases of exceptional success an enhanced award may be justified ...
> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good

faith ... Again the most critical factor is the degree of success obtained ... That the plaintiff is a "prevailing party" may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved.

*Hensley,* 103 S.Ct. at 1940–1941.

Although the Court was initially inclined to account for the degree of success ultimately achieved by the plaintiffs through apportionment of the award sought among the four stages of the proceedings in this action and disallowance of fees incurred at one or more of those stages, See *Bonner v. Coughlin,* 657 F.2d 931, 935 n. 6 (7th Cir. 1981), upon re-examination the Court believes for several reasons that it would be more appropriate to adjust the lodestar upward or downward as suggested in *Hensley.* First, plaintiffs elicited facts relevant to the Court's ultimate decision on the merits at every stage of the trial court proceedings. They were also able to successfully defend on appeal much of the trial court's original decision, in spite of attacks on all fronts by the defendant. Furthermore, this is not a case where a party's liability for attorney's fees stems from his misconduct during discrete stages of the litigation. *Cf. Contour Saws, Inc. v. L.S. Starrett Co.,* 444 F.2d 1331 (1st Cir.1971) (plaintiff's misconduct at certain stages in the proceedings justified potential award to defendant for fees incurred at those stages only). Rather, the defendant's liability here is a result of its willful and deliberate infringement, conduct preceding the lawsuit.

*Plaintiff's Fee Request, Defendant's Objections*

In accordance with the Court's instructions, plaintiffs have submitted materials documenting and categorizing their expenditure of $521,338 for attorney's fees, including fees for paralegals and law clerks, and $91,399.68 in disbursements for miscellaneous travel, hotel, telephone, postage, copying, court reporter, and messenger expenses, as well as for expert witness and professional associate fees and expenses. Attributing 10% of the fees and

expenses incurred at the liability trial, on appeal, and at the second accounting trial to defense against defendants' non-patent-related breach of warranty counterclaim,[1] plaintiffs seek reimbursement for $485,707 in attorney's fees and $83,641 in expenses, for a total of $569,348.

Defendant Heublein challenges both the request in its entirety and portions of it in particular on several grounds.

First and foremost, Heublein questions the appropriateness of the Court's decision to allow post-trial submission of materials documenting plaintiffs' fee request. According to Heublein, such evidence should have been adduced by plaintiffs in their case-in-chief because the issue of attorney's fees was specifically included among the issues to be tried upon remand from the Federal Court. Heublein contends that the Court's acceptance of plaintiffs' unexpurgated billing statements into evidence at trial (materials that were not provided pursuant to defendant's discovery requests) and its invitation to plaintiffs to submit "post-trial evidence" documenting their fee request violated its right to discovery and cross examination. Heublein argues that the materials supporting plaintiffs' fee request should, therefore, be ignored and the request denied in its entirety for insufficient proof.

■ Heublein's position is wholly without merit. Although the decision whether to award attorney's fees to a party in a patent case is inherently related to the merits of the action by virtue of the "exceptional case" requirement of § 285, See *Hairline Creations Inc. v. Kefalas*, 664 F.2d 652, 659 (7th Cir.1981), "whether additional evidence will be allowed on the issue of attorney's fees after a full trial on the merits of a patent action should be left to the sound discretion of the district court." *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 252 (6th Cir.1979). Further-

more, while the decision whether to award fees is related to the merits of a patent claim, the decision regarding the amount of fees to be awarded is more remote from the claim, "requiring an examination of factors beyond the issues decided with the merits of the suit and also different from the largely ministerial task of taxing the traditional items of costs." *Terket v. Lund*, 623 F.2d 29, 33 (7th Cir.1980).

■ The Court believes that the determination of the amount of an attorney's fee award under § 285, or under 42 U.S.C. § 1988 for that matter, is always best dealt with as a collateral, post-judgment matter. Requiring a party to submit a documented fee request prior to resting its case-in-chief would be unrealistic. A request submitted at that time would necessarily be incomplete and would have to be amended later to account for fees incurred during the remainder of trial. Also, such a practice would necessitate lifting the cloak of the attorney-client and work product privileges prematurely, potentially undermining the policies supporting those protections and giving the opposing party certain advantage. Moreover, it would shift the focus at trial away from the merits of the action to a time-consuming inquiry of only conditional relevance. For all the above reasons, the Court will consider all plaintiffs' submissions in support of their fee request.

■ Heublein advances a second argument in favor of denying plaintiffs any recovery for attorney's fees, and that is that their request constitutes "undaunted overreaching" given the limited factual and legal complexity of this case. Heublein points out that the combined trial proceedings in this matter took only eight and a half days, and that plaintiffs' total damage recovery, some $391,000 is relatively modest when considered in light of the fees sought.

---

**1.** The fees and expenses incurred at each stage of the proceedings are as follows:

| | Fees | Expenses |
|---|---|---|
| Liability Trial | $189,754.00 | $ 28,231.00 |
| First Accounting Trial | 165,019.00 | 30,310.00 |
| Appeal | 73,467.00 | 3,999.00 |
| Second Accounting Trial | 93,098.00 | 27,026.00 |
| Totals | $521,338.00 | $ 89,566.00 |

Some of the taxable costs have been deducted from plaintiffs' expenses.

The Court shares defendant Heublein's ostensibly righteous indignation at the sheer size of the award sought by plaintiffs, but goes one step further to express its utter disbelief and dismay at what must be the enormous sum of the time, money, and energy channeled into this litigation as a whole.[2] Lawyers have an independent responsibility, as officers of the court, "to secure the just, speedy and inexpensive determination of every action." Rule 1, Federal Rules of Civil Procedure. The Court's review of this action of only middling complexity leads it to conclude that both counsel either failed to fulfill that responsibility or were ignored by their respective clients. Both sides' dauntless assertion of positions with only marginal legal and/or factual merit, the battery of lengthy depositions, the 114 pages of post-trial "briefs" on liability, and numerous other facts revealed by the record convince the Court that the blame for the obesity of this disproportionate litigation must be placed at the feet of plaintiffs, the defendant and counsel alike. However, the defendant began this tempestuous tiff over tacos with its willful infringement, and the plaintiffs are entitled, as a result, to recover their attorneys fees, limited as need be below to a more reasonable (yet not entirely satisfactory) amount.

## Calculation of the Lodestar

Calculation of the lodestar fee begins with a determination of a reasonable hourly rate for compensation of plaintiffs' attorneys. Plaintiffs were represented throughout this action by the Pasedena, California patent law firm of Christie, Parker and Hale (CPH). Mr. R. William Johnston, a senior partner and plaintiffs' chief trial counsel, is a patent trial attorney with over 30 years experience. The rates charged for his services during the pendency of this action ranged from $115 per hour in 1979 to $175 per hour in late 1983 and early

1984. Mr. Leo J. Young, a general partner in the firm and the lawyer who billed the second greatest number of hours in connection with this action, has two engineering degrees and has been practicing law for 14 years. The rates charged for his services during the pendency of this action ranged from $100 per hour in 1980 to $130 per hour in late 1983 and early 1984.

Taken together, the services rendered by Mr. Johnston and Mr. Young account for 89% of the hours billed plaintiffs for representation by CPH and 95% of the fees charged and paid. The lion's-share of the remainder of the fees paid by plaintiffs were generated by the work of other partners, which was billed out at rates ranging from $129 per hour to $170 per hour; by the work of associates, which was billed out at rates ranging from $75 per hour to $125 per hour;[3] by the work of paralegals, which was billed out at rates ranging from $25 per hour to $50 per hour, and by the work of law clerks, which was billed out at rates ranging from $40 per hour to $90 per hour.

The reasonableness of the rates charged is supported by the fact that the plaintiffs, who presumably had the opportunity to investigate rates charged by counsel with similar qualifications and experience, actually paid for legal services at those rates, and by the figures contained in the Report of Economic Survey prepared under the auspices of the American Patent Law Association and submitted by the plaintiffs. The Report indicates that the hourly rate charged by Mr. Johnston at any time relevant to this lawsuit was at approximately the 75th percentile for fees charged by partners in patent law firms in the Los Angeles area, while the rates charged by Mr. Young were approximately at the 50th percentile. The rates charged by other lawyers in the firm were similarly competitive, and the Court believes the rates

---

**2.** Significantly, Heublein does not compare plaintiffs' fee request to the sum it has expended for legal counsel in connection with this matter.

**3.** The associate whose work was billed out at the highest rate, Frederick Gotha, has extensive experience as corporate patent counsel.

charged for the work of paralegals and law clerks were proportionate. The Court is a firm believer in the mechanics of the marketplace, and therefore must find the fees charged by Mssrs. Johnston, Young, et al. reasonable, subject to adjustments below for work on particular areas of the litigation.

The next step is to multiply the reasonable hourly rates by the number of hours reasonably spent by each attorney. Rather than sift through each individual attorney's work and build this product from scratch, the Court will adopt the approach taken by the district court in *Codex Corp. v. Milgo Electronic Corp.*, 541 F.Supp. 1198 (D.Mass.1982) and begin with the actual time spent and amount billed plaintiffs, 3,971.10 hours and $521,338, and make reductions where appropriate.

### 1. *Reductions Sought by Heublein*

Heublein points to a number of areas in which the compensation sought by plaintiffs is excessive for one reason or another. For the most part, Heublein's criticisms are accurate.

One of the most glaring problems revealed in the submissions supporting plaintiffs' fee request is that of inefficiency and duplication of effort. The Court is hard pressed to imagine when it would ever be appropriate for a lawyer to spend over 150 hours preparing proposed findings of fact and conclusions of law and doing other miscellaneous post-trial chores where the trial itself was completed in three days and the lawyer had spent ample time preparing for the trial, yet Mr. Young and Mr. Johnston did spend over 150 hours on those tasks in June and July of 1982 following the first accounting trial in this matter. According to their records CPH billed plaintiffs $24,164 for 157.8 hours of service; the Court will allow $7,657, representing 50 hours at an average hourly rate of

over $150 per hour, for those services, decreasing the base fee request by $16,507.[4]

The approach taken by CPH towards depositions is also indefensible. As recounted by the defendant Heublein, Mr. Johnston and Mr. Young spent nearly four hundred hours preparing for and attending, in tandem, the depositions of witnesses Hansen, Thompson, Olson, Winters, Wylie, Dowd, Babine, Benson, Klein, McIntyre and Davis, three of whom were plaintiffs' own witnesses. The Court has reviewed several of these depositions and discovered no convincing division of responsibility throughout. An example highlighted by the defendant, the deposition of Whitey Winters, the Lockwood-Greene engineering consultant, does not appear anomalous. For that 3.5-hour deposition, Mr. Johnston and Mr. Young appear to have spent over 65 hours in general preparation and interviewing. Included in the deposition category are 29 hours of Mr. Johnston's time for preparation of deposition digests; one time entry shows that he spent three hours preparing a digest of a two-hour deposition. Because of the duplication of effort and general excessiveness of the time spent on this category of work, the Court believes it appropriate to reduce the base fee request by 50% of the amount billed plaintiffs for the 394.9 hours related to depositions segregated by the defendants, i.e. by $25,874.

Another problem with plaintiffs' submission is that several groups of entries are insufficiently detailed and/or lack explanation. Most notable are the three "drafting" entries of June 21, 1982 and May 9, 1983 and Mr. Young's "preparation for trial" entries from April 26 through June 21, 1982. The Court can surmise that the drafting referred to is drafting of drawings or diagrams for one stage or another of the proceedings, but without more detail it is impossible to determine whether the fees charged were reasonable or necessary. Regarding Mr. Young's "preparation for trial" entries, the Court would not question

---

**4.** Lest it appear that the Court's approach is too harsh, it should be stated that the Court has chosen to slash the most obviously excessive entries to the bone rather than sift through the

entire submission in minute detail, making the minor deletions in nearly every entry that the Court believes could be justified.

an isolated general entry, but when the same entry is repeated over and over again during a two-month period and the amount of money involved is over $20,000, it would be unconscionable for the Court not to act.

Accordingly, the amount charged for drafting and for Mr. Young's work during the period in question, a total of $22,239, is disallowed for insufficient detail and lack of explanation.

Next, the defendant has isolated nearly 700 hours of work performed in the categories of legal research, brief preparation and requests for admissions that it contends could have been performed at a lower level of responsibility than that of senior or general parties and/or that was excessive in light of the particular task performed and the needs of this litigation. The Court has reviewed the entries highlighted by the defendant and agrees with its contentions. In the category of legal research,[5] for example, Mr. Johnston and Mr. Young spent a total of 233 hours performing tasks as mundane as studying the prior patent opinions of Judges Doyle and Baldwin and researching the enforceability of the option clause in the 1976 Agreement between La Hacienda and Heublein under Wisconsin and Texas law. While much of this research may have been necessary, there is no reason why it could not have been performed by associates at a much lower hourly rate, or at least why a lower rate should not have been charged for it.

Brief preparation is another task on which Mssrs. Johnston and Young spent numerous, i.e. almost 400, hours that could have been done by less senior and less expensive lawyers. Moreover, at least some of the hours spent appear excessive. As defendant notes, Mr. Johnston spent almost 100 hours preparing a pre-trial brief for the 1981 three-day liability trial and then turned around and, together with Mr. Young, spent more than 100 additional hours preparing the post-trial brief on identical issues, albeit with different emphases.

Finally, counsel for the plaintiffs also spent over 50 hours preparing requests for admissions that the Court believes could have been performed at a lower level.

For these reasons, the Court is allowing the plaintiffs to be compensated for the 689.5 hours spent by their attorneys on legal research, brief preparation, and preparation of requests for admissions at a reasonable, lowered hourly rate of $75 per hour, resulting in a $46,905 reduction to the base fee request.

The Court has examined the entries included in defendant's "miscellaneous" category in detail and concludes that the tasks described in the entries highlighted would necessarily have demanded the high degree of familiarity with the case that only Mr. Johnston and Mr. Young had. Thus, the Court will not adjust the hourly rate charged for those tasks.

### 2. The Breach of Warranty Counterclaim

Under the mandate of the Court of Appeals for the Federal Circuit,

> An award of attorney fees for the breach of warranty claim is not authorized under § 285. Where an action combines both patent and nonpatent claims, the nonpatent issues may in some instances be so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues. Heublein's counterclaim for damages for anticipatory breach, which was also asserted as giving rise to an implied license to obtain infringing machines, is of such nature. However, its claim for breach of the warranty on noninfringing goods delivered by La Hacienda is a wholly separate and separable claim from the patent issues ... The warranty claim was not, and by its nature could not be, a "united" claim, that is, one asserted as a shield as well as a sword."

*Stickle,* 716 F.2d at 1564.

Plaintiffs have attempted to comply with the mandate of the Federal Circuit by de-

---

**5.** The defendant has included all entries in which legal research appears to be a significant portion of the hours charged.

nominating entries in their fee request that involved work related to their defense against the breach of warranty counterclaim by the labels "DBW" or "Partly DBW." Over 1,600 hours and $200,000 were billed for entries identified in that fashion.[6] In addition, both Mr. Johnston and Mr. Young have sworn from their own personal knowledge of this action that the amount of time spent defending against the breach of warranty claim was at most 10% of the total time spent on each stage of the litigation during which that claim was at issue, i.e. at the liability trial, on appeal and at the second accounting trial. They ask, therefore, that the base fee award be decreased by no more than 10% of the amount charged for those stages of the proceedings, or, $35,631, to reflect noncompensable time spent on that claim. The defendant Heublein takes a different approach, arguing that all hours related in any way to the breach of warranty counterclaim, including all "Partly DBW" entries, must be disallowed under the Court of Appeals' decision.

The Court can adopt neither party's position for several reasons. First, plaintiffs' definition of what constituted time spent on the noncompensable counterclaim is too narrow. They argue that the defendant's incorporation of the breach of warranty allegations in its counterclaim for anticipatory breach, by the terms of the Federal Circuit's decision a patent-intertwined claim, renders all work material to their *liability* for breach of warranty compensable as relating to a patent-intertwined claim. Thus, under plaintiffs' theory, the only noncompensable time is that related solely to the *amount of damages* for the alleged breach of warranty.

A review of the pleadings and briefs submitted at the liability trial reveals that plaintiffs' position is not indefensible. Defendant did, indeed, attempt to argue that the breach of warranty occurring by reason of the defects in the HUB 2000 was the equivalent of a declaration by La Hacienda of its inability to perform the remainder of its contract with Heublein. When considered in conjunction with statements by various La Hacienda employees, Heublein contended that the breach of warranty amounted to an anticipatory breach of the remainder of the contract.

The weakness of plaintiffs' argument is that by no stretch of the imagination were the defects in the HUB 2000 extensive enough, as a factual matter, to prove La Hacienda's utter inability to perform the remainder of its HUB 2000 contract with Heublein, should it have been called upon to do so. Thus, although Heublein's allegations made it appear that La Hacienda's alleged breach of warranty was relevant to the patent-intertwined anticipatory breach counterclaim, it was in truth of only marginal relevance. Whatever breach of warranty that may have occurred was, however, obviously highly relevant to the non-patent-intertwined counterclaim for damages, and the Court, therefore, believes that time spent on the breach of warranty issue is more accurately attributed to that counterclaim.

Heublein's suggested approach is likewise faulty because it puts a burden on plaintiffs that no party should have to bear. While it is true that the party seeking fees must provide detailed enough records to allow the Court to separate compensable from noncompensable time, it would be impractical and inefficient to require an attorney to identify precisely what portion of the generic tasks performed in the course of a lawsuit, like analysis of documents produced in discovery or interviewing general fact witnesses or preparing procedural motions, should be attributed to particular substantive claims in the action. Many of the entries designated "Partly DBW" fall into this category of generic tasks that the plaintiffs could not reasonably be expected to attribute any more precisely among the substantive

---

6. See Appendix to defendant's memorandum in opposition to plaintiffs' request for attorney's fees, at Exhibit B.

claims in the action. The Court will therefore not disallow all entries labelled "DBW" or "Partly DBW."

Instead, the Court is confident that it has sufficient familiarity with the record to make a reasonable, if not precise, segregation of the time and fees properly attributable to the breach of warranty counterclaim at each stage in the action in which that counterclaim was at issue.

Turning to the liability trial, the Court believes it would be reasonable to attribute 35% of the cost of that stage to the breach of warranty claim. La Hacienda's potential exposure to damages from the breach of warranty claim exceeded $100,000 and Heublein, having conceded validity and infringement of the Stickle patents prior to trial, advanced the claim relentlessly. As a result, a significant amount of the trial was spent establishing the circumstances surrounding the development, manufacture, delivery, and operation of the HUB 2000, facts highly relevant to the issue of whether La Hacienda had breached any warranties and whether it could be held liable for any breach that may have occurred.

The breach of warranty claim was one of five major issues [7] on appeal and, in light of the Court of Appeal's limited discussion of that issue, the Court will assign 15% of the fees billed for the appeal to that claim.

Finally, at the second accounting trial, the question of whether Heublein had settled whatever claim it may have had for breach of warranty and the issue of the damages attributable to HUB 2000's defects played some role in the proceedings and 25% of the fees billed can, therefore, be assigned to the noncompensable claim.

On the basis of the percentages assigned above to the breach of warranty counterclaim, the base fee request would be reduced by $100,708 or 19.3%. To reflect the reductions already made above for inefficiency, etc., however, the Court will reduce the adjusted base fee request of $409,812 by an additional 19%, or $77,864.

In summary, then, the Court makes the following reductions to the plaintiffs' base fee request of $521,338:

| REDUCTION | REASON |
|---|---|
| $ 16,507.00 | inefficiency/excessive hours spent preparing findings of fact, conclusions of law |
| 25,874.00 | inefficiency/duplication of efforts in depositions |
| 22,239.00 | insufficient detail/lack of explanation |
| 46,905.00 | work that should have been performed at lower level of responsibility |
| $ 77,864.00 | fees attributable to breach of warranty counterclaim |
| $189,389.00 | Total |

Subtracting $189,389 from $521,338 leaves a lodestar fee of $331,949.

### 3. *Adjustment of the Lodestar Fee*

As noted above, under the Supreme Court's decision in *Hensley*, it is appropriate to adjust the lodestar upward or downward to reflect such factors as the quality of representation and the degree of success achieved by the prevailing party. In this action the Court believes a downward adjustment of the lodestar by 10% is appropriate.

Although plaintiffs were well represented by CPH, it does not follow that the lodestar must be increased. Plaintiffs merely received the sophisticated, specialized representation that they had a right to expect given the rates that were charged by CPH. Besides, this factor is of limited significance where plaintiffs have already paid the fees charged by counsel and the fees are in no sense contingent.

In light of the enormous amount of energy, time, and money expended by the parties and the Federal courts in this action, however, the degree of success obtained can be described as limited, at best.

Plaintiffs have been awarded a total of $270,000 plus prejudgment interest—this after three trials and one appeal, and an

---

7. Ownership of the patents, the existence of a license or implied license, the appropriateness

of the use-royalty damage theory and the attorney's fee award were also considered on appeal.

**640**

expenditure of some $600,000. At the first accounting trial, plaintiffs sought over $2,000,000 as the measure of the royalty a willing licensor and a willing licensee would have agreed upon during hypothetical negotiations under a use-royalty theory, even though they knew a use-royalty had never been discussed by parties in actual negotiations and that there was no evidence such a royalty had ever been agreed upon in a contract between a maker and a user in the food processing industry. *Stickle*, 716 F.2d at 1562. Granted, some of the blame for adoption of that theory by the trial court has to lie with the defendant Heublein because of the less-than-helpful positions it took throughout the pre-appeal proceedings, but there is no doubt, with the benefit of hindsight, that plaintiffs were overreaching in their reliance upon it. Plaintiffs' actions in this regard bear a strong relation to the overblown character of this litigation.

At the second accounting trial plaintiffs sought more than $400,000 in damages under a displaced production theory that also ignored the actual negotiations between the parties. Defendant's cynical suggestion that the displaced production theory was developed in order to project damages high enough to justify the fees charged plaintiffs almost rings true. Advancement of the displaced production theory added needless expense to these already outrageously expensive proceedings.

Plaintiffs courageously, if somewhat foolishly, shot for the stars; they only made it as far as the moon. Accordingly, the Court has reduced the lodestar fee by an additional $33,195 to reflect their limited success.

*Expenses*

Traditionally, a party could not recover general expenses of litigation as part of an attorney's fee award made pursuant to § 285. *See Chromalloy Am. Corp. v. Alloy Surfaces Co.*, 353 F.Supp. 429, 433 (D.Del.1973). However, the Court of Ap-

peals for the Federal Circuit has recently held that, "The purpose of § 285 is ... to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit ... we interpret attorney fees to include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir.1983) (citations omitted). *See also Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed.Cir.1983) and *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 632 (Fed.Cir.1983). In each of the cases cited, the appeals court affirmed an award of attorney's fees by district court that included the prevailing party's disbursements, everything from travel expenses, copying, and telephone charges [8] to professional consultant fees.[9]

The Federal Circuit has not, however, stated explicitly which categories of expenses may be said to have been incurred "in the preparation for and performance of legal services." The issue raised in this case is whether plaintiffs may be reimbursed under that language interpreting § 285 for the more than $30,000 they expended in professional fees for their expert witnesses and consultants.

Although the Court of Appeals' *Central Soya* statement is broad enough to allow inclusion of experts' professional fees in an attorney's fee award, the Court concludes inclusion of such fees is improper. Expert fees are perhaps the most far-removed of any of the costs of litigation from an attorney's services, and the decision whether or not to retain an expert is largely discretionary, while many of the other costs of litigation are not. Moreover, as noted by the Seventh Circuit in *State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 865 (7th Cir.1981), Congress' provision for the recovery of some witness-related expenses in 28 U.S.C. §§ 1821, 1920(3), and 1920(6) creates the implication that it did not intend for a prevailing party

---

**8.** *Codex Corp. v. Milgo Electronic Corp.*, 541 F.Supp. 1198 (D. Mass.1982).

**9.** *Lam, Inc. v. Johns-Manville Corp.*, 219 U.S.P.Q. 601, 604 (D.Colo.1983).

to recover professional fees paid to its own expert. Finally, it is not unusual in complex civil litigation for a party to have had a prior relationship with the expert it hires, thus bringing factors beyond the litigation itself to bear on the fee paid and charged.

Even if there were stronger precedent for awarding experts' fees as part of an attorney's fee award under § 285, the Court would decline to do so here for lack of supporting documentation and explanation. Plaintiffs' submission merely states the amount paid for the services of its experts Brown, England, Wylie, Payne and Davis. The services performed are not described in detail, nor is there any indication of the hours spent or the hourly rate charged. In light of the extensive documentation required to support an attorney's fee award for the services of an attorney, it would be ironic indeed if less were required to support an attorney's fee award for the services of an expert. Because the Court is unable to judge for itself the reasonableness of the professional fees paid by the plaintiffs, it does not include those fees in the award.

Heublein contends that the remainder of the expenses sought by plaintiffs should also be disallowed because of poor documentation. For the most part, however, the Court has been able to link disbursements to work done in the course of the lawsuit and finds them to be reasonable and compensable. The only exceptions are expenses potentially recoverable as taxable costs under 28 U.S.C. §§ 1821 and 1920 (including experts' travel and accommodation expenses), expenses related to Mr. Young's duplicative representation of the plaintiffs at depositions, and a few inadequately documented expenses. (See Appendix 1.) In all, the Court is disallowing $47,301.10 in disbursed expenses.

The last task is to apportion a percentage of the $44,098.58 in compensable expenses [10] reasonably incurred to plaintiffs' defense against the non-patent breach of warranty counterclaim. Adopting the 19% figure derived above, the Court has subtracted $8,378.73 from the compensable expenses to award plaintiffs a total of $35,720.00 for their expenses.

Accordingly,

## ORDER

IT IS ORDERED that the motion of the defendant Heublein, Inc. to amend the Court's Memorandum and Order of April 5, 1984 and the plaintiffs' cross motion to amend the same are DENIED.

IT IS FURTHER ORDERED that judgment be entered in favor of the plaintiffs and against the defendant, Heublein, Inc., for a reasonable attorney's fee including compensable expenses in the amount of $334,474.00, costs to be taxed by the Clerk.

## APPENDIX 1
### Disallowed Expenses (by category)

| | | Description | Amount |
|---|---|---|---|
| 1. | Expert witness fees: | | |
| | 7/31/80 | Brown travel expenses on 6/22, 6/23, 7/11–14 7/15–16 to Minneapolis | $ 1,624.85 * |
| | 6/30/81 | Services of England re interview with Johnston and giving deposition in Texas | 750.00 |
| | 6/30/82 | Professional services of Robert E. Brown re depositions, patents, and related documents | 1,002.51 |
| | 6/30/82 | Professional services of Robert E. Brown re Stickle v. Heublein | 1,326.56 |
| | 7/30/82 | Professional services of Robert Brown from 6/14 to 6/25/82 | 2,989.38 |
| | 8/31/82 | Legal services of Paul R. Wylie | 10,808.91 |

\* Brown apparently did not testify at any trial or deposition on those dates.

10. That figure was arrived at by subtracting the disallowed expenses of $47,301.10 from the plaintiffs' total expenses of $91,399.68.

<u>Disallowed Expenses (by category)</u>

| Description | Amount |
|---|---|
| 8/31/82 Services of Kenneth E. Payne, Esq. | 2,815.00 |
| 4/30/84 Services of our expert witness re reasonable attorney fees through 3/2/84 | 5,436.75 |
| 3/22/84 Davis, Clark & Co. invoice—professional services, etc. | 8,092.50 |

2. <u>Expenses potentially taxable as costs:</u>

| | |
|---|---|
| 7/31/80 Witness fee | 40.00 |
| 8/29/80 Services of court reporter re deposition of Lawrence Klein | 317.92 |
| 10/31/80 Services for preparation of Klein's deposition | 87.20 |
| 4/30/81 Witness re case | 30.00 |
| 4/30/81 Filing deposition subpoena and notice | 3.00 |
| 4/30/81 Travel expenses of Winters 3/31–4/8 | 828.50 |
| 5/29/81 Reporter service re deposition of Philip E. Winters 4/7 and transcript | 387.50 |
| 6/30/81 Services of court reporter re copy of deposition of Earl Byrd | 89.72 |
| 8/31/81 Travel and hotel expenses of Robert Brown re litigation in Madison, WI | 617.64 |
| 6/30/82 Court reporter services re deposition of Robert E. Brown 5/4/82 | 217.50 |
| 6/30/82 Court reporter services re deposition of Albert B. Schilling 5/5/82 and transcript | 685.00 |
| 6/30/82 Court reporter service re deposition of Willard W. Pitman | 330.00 |
| 6/30/82 Court reporter services re deposition of Paul R. Wylie, Jr. 5/26/82 | 239.25 |
| 7/30/82 Court reporter services re depositions of Dowd and Babine, held 6/3 & 6/4/82 | 956.25 |
| 7/30/82 Court reporter services of Loretta Peters re transcript of proceedings on June 22, 1982 | 250.25 |
| 7/30/82 Court reporter services re transcript of trial, June 24, 1982 | 144.30 |
| 8/31/82 Court reporter services re. transcript of proceeding had upon trial to court in U.S. District Court, Madison, WI on 6/23–6/24/82 | 432.00 |
| 2/29/84 Reporting services re depositions of Lawrence F. Klein on 2/2/84 and Clark K. Benson on 2/2/84 | 641.15 |
| 3/31/84 Reporter's services re depositions of John Martin Davis, Jr. and Thomas C. McIntyre | 237.00 |
| 2/28/84 Marty Davis' airfare to Madison, WI | 402.00 |
| 3/22/84 Scott Adams' expenses and airfare | 689.20 |

3. <u>Mr. Young's travel expenses for duplicative representation at depositions:</u>

| | |
|---|---|
| 12/31/80 Travel expenses of Young re depositions of Hanson, Thompson and Olson | 653.00 |

<u>Disallowed Expenses (by category)</u>

| | Description | Amount |
|---|---|---|
| 6/30/82 | Travel expenses of Young re depositions of Down and Babine in Farmington, CT | 1,164.55 |
| 3/31/84 | Expenses of Mr. Young re depositions in Dallas | 697.00 |
| 2/22/84 | LJY's room at Marriott | 304.44 |

4. Inadequately documented expenses:

| | | |
|---|---|---|
| 9/30/81 | Travel expenses re trial in Madison, WI | 1,603.58 |
| 4/30/82 | Travel expense | 234.65 |
| 2/28/84 | Hotel rooms in Madison | 172.04 |
| | TOTAL DISALLOWED EXPENSES | $47,301.10 |